UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD GLASS,

    Plaintiff,

v.

JOSEPH FIELDS, NIKITA FREDERICK,
DAWN BEAUREGARD,

    Defendants.
_____/

Case No. 04-71014

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [68]**

Plaintiff, a pretrial detainee, filed this civil rights action pursuant to 42 U.S.C. § 1983. He alleges that Defendants Fields, Frederick and Beauregard, all Wayne County Sheriff's Department employees working at the Wayne County Jail,[1] violated his Fourth, Fourteenth, and Eighth Amendment rights when another pretrial detainee with a propensity for violence was placed in a cell with other detainees, like Plaintiff, who were scheduled for Friend of the Court hearings. (2nd Am. Compl.) That detainee subsequently kicked Plaintiff in the face, causing serious injury to his right eye.

This matter is now before the Court on Defendants' motion for summary judgment, arguing that (1) no genuine issues of material fact exist for trial whether these Defendants were deliberately indifferent to a substantial risk of serious harm to Plaintiff – they were not;

---

[1]Defendant Walls was dismissed with prejudice on September 14, 2006, by a stipulated order [73], and Defendant Wayne County was dismissed with prejudice by a stipulated order entered on April 6, 2006 [57].

and (2) that these Defendants are entitled to qualified immunity. For the reasons stated below, this Court GRANTS Defendants' motion for summary judgment.

**I.   Facts**

   **A. Willie Blade**

      **1. December 29, 2002**

On December 29, 2002, at approximately 3:55 a.m., Willie Blade was booked at the Wayne County Jail through the male registry on the first floor. His booking and arrest summary shows that he was arrested by Wayne County Sheriffs on a Friend of the Court warrant for non-support. (J. Fields Dep. at 15, 20-21; Dep. Ex. 1.)

Defendant Fields was working the male registry on the first floor of the Wayne County Jail on December 29, 2002 during the midnight shift (11 p.m. to 7 a.m.). (Fields Dep. at 14-15.) At the time of his deposition, Fields had no personal recollection of booking and registering Blade into the Wayne County Jail system. Nonetheless, his operator number and name appear on Blade's booking and arrest summary (Pl.'s Ex. W) and on computer entries indicating that on December 29, 2002, at 3:55 a.m., a wants/warrants check was run for Blade; and, at 3:57 a.m., Blade was assigned new housing (Pl.'s Ex. C). Fields also identified all but the "4NE14" ward assignment as his handwriting on Blade's inmate or floor card (Pl.'s Ex. D). (Fields Dep. at 15, 17-18, 36-39, 47, 48-50, 71.)

At approximately 6:00 a.m., Mr. Blade was in the Health Clinic on the second floor of the Jail. New detainees are sent to the second floor Health Clinic if they say they have a medical/psychiatric history or appear to have medical/psychiatric problems. (Thompson Dep. at 50-51.) Nurse Thompson, who was working the midnight shift (11 p.m. to 7:30

a.m.), first observed Willie Blade eating a sugary cereal outside the clinic area around 6:00 a.m. She asked him why he was doing so when he was diabetic. He answered, "I'm insane." (Thompson Dep. at 30-34, 44.) She recalls that Blade made this statement in front of the Wayne County Sheriff Deputies who were present at the time, but does not recall the names of those deputies. (Thompson Dep. at 56-57.) Nurse Thompson never told any of the Wayne County Sheriff Deputies about Blade's mental status but testified that they had the opportunity to observe his threatening, bizarre behavior. (Thompson Dep. at 84.)

Nurse Thompson then took Blade's blood sugar level, recorded that it was 431, a life threatening level, and gave him insulin at 6 a.m. (Thompson Dep. at 62-63; Dep. Ex. 5.)

At 6:15 a.m., Nurse Thompson wrote a psychiatric referral for Willie Blade to the Jail's mental health ward on the fourth floor. The referral form provided a list of medications Blade reported he was taking, noting "questionable dosages." It also provided Blade's "I'm insane" statement and Nurse Thompson's comments that Blade had a history of paranoid schizophrenia, and was "bizarre, hostile, threatening," and reported "visual hallucinations." (Defs. Ex. 9 at 1-2.) She did not recall why she wrote that Blade was "threatening." She was not sure whether it was something Blade said or something she observed. (Thompson Dep. at 60.) She did not recall any deputy telling her that Blade was threatening. (Thompson Dep. at 61.)

By 6:30 a.m., Nurse Thompson had obtained a telephone order from a jail psychiatrist, Dr. Hudson-Collins, that Blade should be admitted to the Jail's mental health ward located on the fourth floor so that he could be seen by a jail psychiatrist. The doctor also ordered that Blade be housed alone. (Defs.' Ex. 9 at 3, 19; Dr. Hudson-Collins Dep. at 26-27.)

Nurse Thompson placed a "clinical flag" on Willie Blade, noting that he was "loud, hostile and agitated," had been "cursing at the deputies," had stated that he was a paranoid schizophrenic, and was last seen at Wyandotte Hospital in September 2002. She also scheduled an appointment for Blade on December 30, 2002 with a Henry Ford doctor. (Defs.' Ex. 9 at 3, 19; Thompson Dep. at 59-67, 70, 72-73, 75.) The Wayne County Sheriff Deputies would not get the doctor's order that Blade be housed alone because it was part of his medical records and thus protected under federal privacy laws. (Thompson Dep. at 80-81, 84; Cox Dep. at 24.)

At 8 a.m., Nurse Thompson's midnight shift was over and Nurse Hurst, who was working the day shift (7 a.m. to 3 p.m.), rechecked Blade's blood sugar level, recording it at 468, a life-threatening level. (Defs. Ex. 9 at 14; Thompson Dep. at 53, 58, 63; Hurst Dep. at 12-13.) By 8:30 a.m. Nurse Hurst had obtained a phone order from Dr. Barth for diabetic medication which Hurst then administered to Blade. (Defs.' Ex. 9 at 14, 20.)

By 2:00 p.m., Blade was admitted to the Jail's mental health ward on the fourth floor and assigned housing in cell 4NE14, which has two bunks. (Defs.' Ex. 9 at 9; Lauron Dep. at 18, 46-47.) Psychiatric progress notes prepared by Nurse Washington at that time note that Blade was "alert, hostile and very loud," that his blood sugar was 431 when seen in the Health Clinic prior to arriving at the fourth floor, that Dr. Barth had ordered and patient was given insulin and was to have his blood sugar rechecked at 4:00 p.m. (Defs.' Ex. 9 at 9.)

At 4:00 p.m., Nurse Hurst rechecked Blade's blood sugar level and recorded that it was 232. (Defs.' Ex. 9 at 14.)

At 6:00 p.m., Nurse Lauron ordered that Blade serve a "time out x 24 for belligerent, loud, uncooperative, hostile behavior," meaning that he was to be segregated for 24 hours.

4

Nurse Lauron made that decision on her own based on Nurse Cushingberry's notes. Those notes stated that Blade was "extremely agitated, aggressive and threatening," and was uncooperative. Blade refused to answer questions on the nursing assessment form, and Nurse Cushingberry was unable to obtain Blade's blood sugar level "due to his out of control behavior"; i.e., "throwing things in cell." Nurse Cushingberry called Dr. Hudson-Collins, a staff psychiatrist, who gave a one-time order for psychiatric medications that Nurse Cushingberry then administered by injection. (Defs.' Ex. 9 at 9-10, 17, 19, 21; Lauron Dep. 10, 14-16; Dr. Hudson-Collins Dep. at 20-21, 47-50.)

Nurse Lauron, who was the charge nurse working the afternoon shift (3:00 p.m. to 11:30 p.m.) on December 29, 2002, filled out a Psychiatric Nursing Admission Assessment form based on information she had obtained from the second floor Health Clinic referral form and from her observations of Blade. She wrote that Blade was "very agitated, hostile and verbally aggressive. Unable to obtain information at this time." (Lauron Dep. at 15-17, 19-23, 26-30, 32-35, 37.) Upon completion, the form would have been kept in the nurse's station on the fourth floor and not given to anyone else. These forms are not put into the Jail computer system. (Lauron Dep. at 39, 46-47.) Moreover, orders that a detainee or inmate be placed in "time out" for 24 hours are not recorded on the detainee's Floor Card that is available to the Sheriff Deputies. (Defs.' Ex. 9 at 19; Lauron Dep. at 10; Dr. Hudson-Collins Dep. at 53-54.) There are, however, two ways Sheriff Deputies may obtain this information: (1) from a log maintained in the deputy station on the fourth floor; and (2) from a board located on the wall of the corner of that mental health floor where the detainee is housed. (Dr. Hudson-Collins' Dep. at 29-33; Cox Dep. at 52-54.)

5

At 8:30 p.m., Nurse Lauron noted that Willie Blade was "resting on his back with regular breathing rhythm" and showing "no distress" but assessed that Blade had a "potential for violence" and thus his behavior was to be monitored. (Defs.' Ex. 9 at 10.)

At 10:50 p.m., Nurse Cushingberry noted that Blade told her that he felt "much better," that he was alert, oriented, his mood was calmer, he was no longer agitated and was much more cooperative. She referred him to the Health Clinic for follow-up medical care for his diabetes. (Defs. Ex. 9 at 10.)

**2. December 30, 2002**

At 5:57 a.m., an entry on the Jail computer was made showing that Blade was moved from his cell on the fourth floor, 4NE14, so that he could appear at a 9:00 a.m. scheduled hearing with the Wayne County Friend of the Court. This is the only place where that information was recorded. (Cox Dep. at 59-60.) Deputy Cox, who usually worked on the fourth floor psychiatric unit, reviewed the "court list" for names and cell numbers of detainees on the fourth floor that were scheduled to appear in Court on the 14th Floor of the Jail on December 30, 2002. Willie Blade's name was on that list. Noting this, Deputy Cox went to a computer located on the fourth floor and made the 5:57 a.m. entry, changing Willie Blade's status from an inmate in his cell on that floor to a detainee that was to be transported to court. Because the computer entry states "CRT" rather than "REG", Deputy Cox testified that Willie Blade most likely was taken from his cell to the bullpen located on the fourth floor Mental Health ward. This is done every day and is known as "the court pull." (Cox Dep. at 36.) Mr. Blade was then likely taken from the bullpen by a Sheriff's Deputy assigned to the Jail as a "rover" or "court officer" and escorted by that Deputy from the fourth floor to either the second floor Health Clinic so that Blade could have his blood

6

sugar level rechecked or to the first floor registry area. Blade was ultimately placed in cell #3 on the female side of the registry with the other detainees awaiting deputy escorts for scheduled Court dates. (Cox Dep. at 18-22, 24, 26-27, 29-30, 33-36, 40-42, 44.)

There is no computer entry that informs deputies working in the first floor registry area that a detainee is dangerous and should be isolated from the general population. (Cox Dep. at 30-31.) There are situations where an inmate taken from the fourth floor to the first floor registry is deemed to be someone that should be isolated from the general population. In those circumstances, the fourth floor deputy escort, along with a supervisor, takes the prisoner to the first floor supervisor who then makes the determination as to where that prisoner will be placed and records that information. (*Id.* at 31-35, 41-42, 44-45, 55-56.) There is no general requirement that the transfer must be done with a supervisor when an inmate has been ordered to be housed alone when on the Jail's fourth floor psychiatric ward. (Cox Dep. at 48.)

The Jail records next show that at 6:00 a.m., Blade had his blood sugar level checked by Nurse Dorthard. It was recorded to be 151. (Defs. Ex. 9 at 14, 17.) Beyond that, there is only testimony from Plaintiff that, when he was placed in a cell on the female side of registry on December 30, 2002, he believed that Willie Blade was already in cell #3 along with about 15 to 20 other men.

Deputy Cox did not escort Willie Blade from the fourth floor bullpen to anywhere else in the Jail on December 30, 2002, and has no knowledge of when Blade was transferred from the fourth floor to the first floor. (Cox Dep. at 20, 37.) The deputy transporting Blade could have come from other than the fourth floor. (Cox Dep. at 51.) There is no evidence that Defendants Fields, Frederick or Beauregard took part in the transfer of Blade to any

7

part of the Jail on December 30, 2002. Plaintiff presents no evidence showing which Sheriff's Deputy or Deputies transported Blade to the first floor and placed him in the same cell on the female registry side of the Jail as Plaintiff.

**B. Richard Glass**

On December 29, 2002, at approximately 9:00 p.m., Plaintiff Richard Glass was pulled over in his car by the Westland police. The police arrested Plaintiff on two outstanding bench warrants for his arrest: one from the Friend of Court for failing to pay child support and the other for failing to pay a ticket issued in northern Michigan for fishing salmon. Plaintiff was transported to Wayne County's Henry Ruff facility and remained there from about 10 p.m. on December 29th to 1:00 a.m. on December 30, 2002. (Glass Dep. at 36-41.)

At about 1:00 a.m. on December 30, 2002, Plaintiff was transported to the Wayne County jail because he was scheduled to see a Friend of the Court Referee on December 30, 2002 at 9:00 a.m. He arrived at the Wayne County Jail about 2:00 a.m. and was placed in a cell on the first floor, male side of the Jail with three other men. He stayed in that cell until about 3:00 a.m. (Glass Dep. at 45-46.)

At about 3:00 a.m., Plaintiff and the three other men were taken to a smaller cell on the first floor of the Jail and held there until about 4:00 a.m. At that time, Plaintiff was taken out of the cell and over to the female side of the Jail on the first floor, was fingerprinted, had his photo taken, and was asked some questions by a female deputy. Then, about 5:00 a.m., he was placed in another cell on the female side of the Jail with about 15 to 20 other men (cell #3). (Glass Dep. at 46-58.) The female side of the Jail is where female inmates are booked and processed by female deputies and is identified as the "female registry."

8

It is also used as an "overflow holding area" for male inmates who are being transported out of the Jail for various reasons like court appearances. (Beauregard Dep. at 16.) There is no evidence showing that Defendants Fields, Beauregard or Frederick placed Plaintiff in cell #3 on the female side of the registry.

Plaintiff testified that Willie Blade was already in that cell when he was brought in. Plaintiff went into the cell, immediately found an open spot on the wall, sat down, crossed his arms, pulled the hood on his shirt over his head, put his head down, and avoided all eye-to-eye contact with other males in the cell so as to avoid any confrontation. (Glass Dep. at 58-61.)

### C. Kicking Incident

At about 8:20 a.m. on December 30, 2002, Plaintiff testified that another pretrial detainee, Willie Blade, suddenly kicked him in the face. Plaintiff hit his head against the wall and felt pain in his eye. Another cellmate grabbed him, pulled him near the cell door, and yelled for the Sheriffs. Two sheriffs immediately came down the hallway, opened the cell door, pulled Plaintiff out, brought Plaintiff a wheelchair, and called the infirmary for nurses. They also pulled Blade out of the cell. (Glass Dep. at 61-63.)

Defendants Frederick and Beauregard were both working the day shift (7 a.m. to 3 p.m.) on December 30, 2002, and both were assigned to work the Jail's female registry on the first floor on that date. (Frederick Dep. at 8; Beauregard Dep. at 13, 50-51.)

Defendant Beauregard was the first Jail employee to see Plaintiff after the assault. (Beauregard Dep. at 22-25.) Corporal Beauregard first became aware of a problem when she heard a loud commotion coming from cell #3 where Plaintiff and Blade as well as the other males awaiting Friend of the Court hearings were being held. Defendant Beauregard

was in the officers' office down the hall from cell #3. After hearing the commotion, she went to cell #3, and saw Plaintiff standing at the cell door, holding his face. She saw that Plaintiff had a small abrasion under his eye and some bleeding. (Beauregard Dep. at 22-23, 42, 52-53.) Other cellmates pointed to Willie Blade, telling her that Blade kicked Plaintiff. Defendant Beauregard pulled Plaintiff out of the cell, sat him down in a chair outside another cell, and then took Plaintiff to the second floor infirmary to be examined by a doctor. (Beauregard Dep. at 23-25, 29, 53.)

Defendant Beauregard testified that the doctor examined Plaintiff's face in her presence for about 20 to 30 minutes. The doctor wanted to send Plaintiff to the hospital, but Plaintiff refused to go because he wanted to see his own doctor. (Beauregard Dep. at 28-29, 31-32, 54, 58.) Corporal Beauregard then escorted Plaintiff back downstairs to the first floor female registry where he was placed in a holding cell. Plaintiff was allowed to call his brother so that Plaintiff could post bond and get to his doctor soon. (Beauregard Dep. at 31-32, 56, 59-60.) Plaintiff signed a "Prosecution Rights Form" indicating that he wanted to prosecute, and Beauregard signed the form as a witness to his signature. (Beauregard Dep. at 35-40.)

Defendant Frederick testified that when she heard a commotion coming from cell #3, she ran after Corporal Beauregard to that cell. She saw Corporal Beauregard bring Plaintiff out of the cell and sit him in a chair. (Frederick Dep. at 9-10.) She heard Plaintiff say that some man kicked him in the face, and he was just sitting there. Observing a cut over one of his eyes and lots of blood, she called the Jail's medical floor and got a nurse. One of the medical nurses responded by coming down to the first floor registry area, the nurse treated Plaintiff, and within 10 minutes Plaintiff was taken up to medical on the second floor.

Corporal Beauregard was present during all of this and accompanied Plaintiff up to medical. (Frederick Dep. at 10-14, 61.) Defendant Frederick did not accompany them. (Frederick Dep. at 36.)

Defendant Frederick called a sergeant and made an incident report. The report indicated that the incident occurred about 8:41 a.m. and was identified as an "assault with minor injury." (Frederick Dep. at 15-18, 28-29, 31.) Frederick then went back to cell #3, asked for written witness statements, but did not receive any. The only witness statement was the one prepared by Plaintiff himself. Although Plaintiff's cellmates would not prepare written witness statements, they did identify Willie Blade as the man who kicked Plaintiff in the face. (Frederick Dep. at 19-21.)

Plaintiff testified that, after he was removed from cell #3, two nurses assisted him, and then took him by wheelchair to the infirmary on the second floor of the Jail. He was bleeding and his right eye was injured. (Glass Dep. at 64-65.) Plaintiff told the male nurse who first attended him that he had some prior vision loss in his right eye. (Glass Dep. at 66.) Plaintiff had previously injured his right eye at work in 1989, had had a couple of surgeries, and had a partial loss of vision in that eye as a result. (Glass Dep. at 14-18; 55.) While being treated on the second floor infirmary, Plaintiff testified that a nurse told him that Blade was mentally ill and a violent man. (Glass Dep. at 100-01.)

James Hurst was the nurse who first treated Plaintiff at 9:00 a.m. when Plaintiff was sitting in the Jail registry area. He found Plaintiff to be alert and oriented, and his blood pressure and all other vital signs to be normal. Plaintiff had a 1 centimeter by 1/2 centimeter laceration under his right eye with minimal bleeding, the white of his eye appeared irritated and red, and the center of his forehead appeared bruised with superficial

abrasions. Plaintiff complained of a severe headache and light-headedness. Plaintiff told him that he had been just sitting in his cell when he was suddenly kicked in his right eye and forehead. Plaintiff also told him that about 14 years earlier he had lost the vision in his right eye in a work accident. Nurse Hurst referred Plaintiff to the doctor who was in the Jail Health Clinic. (Hurst Dep. at 29-35.)

After being treated by the nurse, Plaintiff subsequently received treatment from a doctor at the Jail's second floor infirmary. He complained of a headache and pain in his right eye. The doctor recommended that he go to the hospital. Plaintiff requested that he be taken to Henry Ford Hospital because that is where he was previously treated for his earlier eye injury. The doctor gave Plaintiff the Wayne County Jail's Blue Cross Blue Shield number in case Plaintiff's insurance was not accepted at Henry Ford. (Glass Dep. at 67-68; Beauregard Dep. at 54-55, 59-60.)

Plaintiff was then taken to a courtroom on the 13th floor of the Wayne County Jail for his scheduled hearing with the Friend of the Court, but subsequently learned that no judge was available on December 30, 2002. He was then transported back to the first floor of the Jail and placed in a cell on the male side of the registry. About 5:00 p.m., he was taken back to the second floor infirmary and then transported to Henry Ford Hospital around 7:00 p.m. While he was at the hospital, his brother posted bond, and he was released from custody. Plaintiff then had surgery to repair a torn eye duct on his right eye and was subsequently released from the hospital on December 31, 2002. (Glass Dep. 69-74.) Over a year later, Plaintiff subsequently developed glaucoma, had his right eye removed in 2004, and wears a prosthetic right eye.

Plaintiff filed this § 1983 action on March 19, 2004 against Wayne County and a number of other individuals. As stated above, the only remaining Defendants are Fields, Frederick, and Beauregard. Wayne County and the other Defendants have been dismissed with prejudice.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position

will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

### A. Deliberate Indifference Standard

Plaintiff was a pretrial detainee at the time he alleges his constitutional rights protected by the Fourth, Eighth, and Fourteenth Amendments were violated. Plaintiff does not allege any claim under the Fourth Amendment. Rather, he alleges that Defendants were deliberately indifferent to a substantial risk of serious harm when a violent pretrial detainee was placed in a cell shared by Plaintiff and other detainees waiting for their scheduled Friend of the Court hearings. Because he was a pretrial detainee, Plaintiff's rights are protected by the Fourteenth Amendment, not the Eighth. Prison employees violate the Eighth Amendment when they act with deliberate indifference to the serious needs of post-conviction prisoners. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). Pretrial employees enjoy analogous protection under the Due Process Clause of the Fourteenth Amendment. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001).

To succeed on his § 1983 claims alleging violations of the Fourteenth Amendment, Plaintiff must establish that the remaining Defendants acted with "deliberate indifference" to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Showing negligence is not enough. *Farmer*, 511 U.S. at 835-36.

A pretrial detainee's claim of deliberate indifference has both an objective and subjective component. *Farmer*, 511 U.S. at 834. "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* The objective

14

component requires the existence of a substantial risk of serious harm. *Id.* at 834. To satisfy the subjective component, Plaintiff must show that Defendants (1) "subjectively perceived facts from which to infer substantial risk to the prisoner," (2) "did in fact draw the inference," and (3) "then disregarded that risk." *Id.* at 837. "Emphasizing the subjective nature of this inquiry, the Supreme Court has noted that 'an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Comstock v. McCrary*, 273 F.3d 693, 697 (6th Cir. 2001)(quoting *Farmer*, 511 U.S. at 838 and adding emphasis). Nonetheless, "a prison official may 'not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Id.* (quoting *Farmer*, 511 U.S. at 843, n. 8).

The objective component of Plaintiff's claim is not at issue here. It is not debated that at the time he was detained at the Wayne County Jail on December 30, 2002, Willie Blade posed a substantial risk of serious harm to the safety of other pretrial detainees housed in the same cell with him. Rather, Defendants' motion argues that Plaintiff cannot show that a genuine issue of material fact exists as to the subjective component of Plaintiff's claim. This Court agrees with Defendants.

"'[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Watkins*, 273 F.3d at 686 (quoting *Farmer*, 511 U.S. at 837). "If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the . . . Fourteenth Amendment." *Id.* (citing *Farmer*, 511 U.S. at 837-38). Thus,

15

Plaintiff must do more than show a question of fact exists whether Defendants should have known that Willie Blade had violent tendencies and thus should not be placed in the same cell with other pretrial detainees.  Plaintiff must show that a question of fact exists whether Defendants knew that Willie Blade was in the same cell as Plaintiff and others, that his presence created a substantial risk of serious harm to their safety, and then disregarded that risk. Plaintiff has not met that burden.

The Court begins its analysis by examining the evidence presented on the subjective component of Plaintiff's claim against  Defendant Joseph Fields.

**B.  Joseph Fields**

Plaintiff argues that Defendant Fields is liable for violating his constitutional rights because (1) he failed to complete the form asking health/psychiatric questions during Blade's registration; (2) he failed to either learn of or adhere to the isolation order given by Dr. Hudson-Collins; and (3) he had actual knowledge of Blade's psychotic and dangerous nature, but disregarded that knowledge when he either neglected or refused to prevent others from placing Blade in a cell with other non-violent detainees.  (Pl.'s Resp. at 18.) Plaintiffs' arguments are rejected.

First, Plaintiff presents no evidence that Defendant Fields had actual knowledge that Willie Blade should not be housed with other non-violent detainees and then deliberately ignored that risk or prevented others from addressing it.  Specifically, there is no evidence that Defendant Fields was involved with Blade's movement within the Jail on December 30, 2002.  Second, Plaintiff's remaining complaints about Defendant Fields allege mere negligence, not constitutional violations.  "Deliberate indifference is not mere negligence." *Watkins*, 273 F.3d at 686.  "[I]t is not enough for plaintiff to demonstrate a question of fact

[what] the police officers or sheriff's deputies *should have* known . . . ." *Id.* "'[A]n official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Comstock*, 273 F.3d at 697 (quoting *Farmer*, 511 U.S. at 838 and adding emphasis). *See also Brooks v. Celeste*, 39 F.3d 125, 129 (6th Cir. 1994) (observing that *Farmer* teaches that repeated acts of negligence do not "by themselves constitute deliberate indifference."). Third, contrary to Plaintiff's arguments, the evidence presented shows that Defendant Fields responded reasonably to the safety risk at issue here by having Willie Blade transferred on December 29, 2002, from the first floor registry to the Health Clinic to be examined and evaluated before being incorporated into the Jail population. *See Farmer*, 511 U.S. at 844. Accordingly, Plaintiff's § 1983 claims against Defendant Joseph Fields are dismissed.

The Court now considers Plaintiff's § 1983 claims against Defendants Frederick and Beauregard.

### C. Nikita Frederick and Dawn Beauregard

It is undisputed that Blade was transferred to cell #3 on the female side of registry on December 30, 2002, between 5:57 a.m. (the time Deputy Cox made a computer entry that he was "out to court") and 8:20 a.m. (the time that Blade kicked Plaintiff in the face in cell #3). It is likewise undisputed that Defendants Frederick and Beauregard were working the day shift (from 7 a.m. to 3 p.m.) on December 30, 2002. Thus, Plaintiff argues that, <u>if Blade was transferred after their shift started at 7:00 a.m.</u>, then these Defendants should have known that Blade had a propensity for violence and thus should not be placed in cell #3 along with Plaintiff and other cellmates scheduled for court appearances. Even assuming

17

that Defendants Frederick and Beauregard were on duty when Blade was transferred to cell #3, Plaintiff must show that a question of fact exists whether Defendants: (1) knew that Willie Blade was present in cell #3; (2) knew that his presence in cell #3 created a substantial risk of serious harm to the safety of Plaintiff and other cellmates; and (3) despite this knowledge, disregarded that risk. Plaintiff has not met that burden.

Plaintiff merely presents evidence of what Defendants should have known and should have done; not what they actually knew and then disregarded. This is not enough. "'[A]n official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.'" *Comstock*, 273 F.3d at 697 (6th Cir. 2001)(quoting *Farmer*, 511 U.S. at 838 and adding emphasis). There is no evidence that either Frederick or Beauregard (1) was the individual who was responsible for transferring Blade to cell #3, (2) was aware of his presence in cell #3, or (3) was aware facts from which an inference was drawn that Willie Blade's presence in cell #3 posed a substantial risk of harm to the safety of Plaintiff and other cellmates and then disregarded that inference. Likewise, there is no evidence that these Defendants refused to verify underlying facts that they strongly suspected to be true or declined to confirm inferences of risk that they strongly suspected to exist. *See Comstock*, 273 F.3d at 697 (quoting *Farmer*, 511 U.S. at 843, n.8).

Plaintiff's arguments about what these Defendants should have perceived but did not are not enough to establish § 1983 claims. Moreover, Plaintiff states claims of negligence, not constitutional violations or § 1983 claims, when he complains about Defendants' failure to adequately investigate Blade's assault on him. Accordingly, Plaintiff's § 1983 claims against Defendants Frederick and Beauregard are dismissed.

**IV. Conclusion**

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED, and the claims in Plaintiff's complaint are DISMISSED WITH PREJUDICE.

        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: May 22, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on May 22, 2007, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager